IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVVISION

| | | |
|---|---|---|
| MARYJO I. ADKINS, | ) | CASE NO. 3:25-cv-02148-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| FRANK BISIGNANO, | ) | |
| Commissioner of Social Security | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Maryjo I. Adkins ("Adkins") seeks judicial review of the final decision of the

Commissioner of Social Security, denying her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")

applied proper legal standards, I recommend that the Commissioner's final decision denying

Adkins' DIB and SSI applications be affirmed.

## II.      Procedural History

Adkins protectively filed for  DIB and SSI on July 14, 2023, alleging a disability onset

date of June 10, 2022. (Tr. 234). The claims were denied initially and on reconsideration. (Tr. 73,

90, 98-99). Adkins then requested a hearing before an ALJ. (Tr. 140-41). Adkins, represented by

counsel, and a Vocational Expert ("VE") testified before an ALJ on June 6, 2024. (Tr. 35-71).

On October 18, 2024, the ALJ issued a written decision finding Adkins not disabled. (Tr. 7-18).

The Appeals Council denied her request for review on August 13, 2025, making the hearing

1

decision the final decision of the Commissioner. (Tr. 1-6; see 20 C.F.R. §§ 404.955, 404.981).

Adkins timely filed this action on August 6, 2025. (ECF Doc. 1). She asserts two assignments of error:

1. The ALJ erred in failing to consider Adkins' obesity in isolation or in combination with other impairments in making an RFC determination.

2. The ALJ erred in improperly finding Adkins' claim that she could not sustain full-time employment unsupported by the record because of Adkins' activities of daily living.

(*Id.* at p. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Adkins was born September 25, 1992. (Tr. 234). She was 29 years old on her alleged onset date, making her a younger individual age 18-44 according to agency regulations. (Tr. 28). She has at least a high school education. (*Id.*). She has past relevant work as a cashier, DOT 211.462-010, SVP 2, light exertional level. (*Id.*).

#### B.    Relevant Medical Evidence

On May 3, 2022, Adkins presented at the Mercy Health St. Rita Medical Center Urgent Care complaining of left foot pain that had been present "on an off for a long time." (Tr. 1198). She had recently had an x-ray taken of the foot that was negative. (*Id.*). Adkins noted she had missed work yesterday and needed a doctor's note in order to return. (*Id.*).

Adkins attended a follow up appointment with Lloyd Briggs, M.D., of the Orthopaedic Institute of Ohio, on July 25, 2022. (Tr. 1121). Adkins was 10 weeks post CAM walker boot immobilization, and had been bracing and using Neurontin, but had seen no significant improvement. (*Id.*). She indicated that the swelling was better, but the pain was possibly worse than it had been. (*Id.*). Adkins' BMI was 34.70, and she was able to do single limb heel raise

with no heel inversion and only able to get the heel one inch off of the ground. (*Id.*). There was left foot mild planovalgus deformity equal and symmetric to the right foot, maximal area of tenderness over the posterior tib tendon posterior to the left ankle medial malleolus, mild tenderness in the posterior tibial nerve, and minimal discomfort along the posterior tibial nerve as it runs up the leg with some mild tenderness. (*Id.*). She was assessed with left ankle pain, unspecified chronicity; posterior tibial tendinitis of the left lower extremity; and tarsal tunnel syndrome of left side. (*Id.*).

A left ankle MRI performed on August 8, 2022 showed severe sinus tarsi syndrome with stress edema of adjacent talus and calcaneus; prominent, actively inflamed os trigonum, with degeneration of the articular surfaces, and reactive osteoedema of the posterolateral talar body and adjacent swelling of the posterior ankle capsule; pes planus; and intact ligament and tendon structures. (Tr. 1918).

Adkins presented to the Emergency Department on August 17, 2022 for left lower leg pain, indicating that the pain started the day before on the lateral aspect of her knee, radiating behind her knee and to the lateral mid-calf. (Tr. 1183). She described the pain as a constant intense ache that worsens with use and weight bearing, and reported muscle weakness, warmth over the area, altered range of motion in the left knee, and occasional tingling in her left toes. (*Id.*). Examination revealed some tenderness on palpation of the left lateral leg and calf with limited range of motion and strength, and Adkins had severe pain when she attempted ambulation. (Tr. 1186). She was assessed with a strain of her left calf muscle. (Tr. 1188).

At an August 19, 2022 follow-up visit with Dr. Briggs, Adkins reported that her pain had grown worse and now rated 7/10. (Tr. 1118). She felt that neither bracing, injections, nor home exercises had helped at all. (*Id.*). Dr. Briggs recommended a steroid injection of the subtalar joint

and a Vitamin D study, but if those were ineffective he would propose considering a posterior tibial reconstruction and os trigonum excision that would cause her to be off of work for an extended period. (Tr. 1118-19).

Adkins returned to the Mercy Health Urgent Care on October 20, 2022, complaining of "pain in her left arm, her hips and essentially all over her body." (Tr. 1173). She stated that she was being worked up for rheumatoid arthritis, and that the pain moves to different parts of her body at different times. (*Id.*). She had been prescribed medication by her primary care provider but found it to be ineffective. (*Id.*).

At an appointment with Kevin Erhart, PA-C, on November 30, 2022, Adkins reported two moths of right shoulder pain, and over the past two weeks she had developed some numbness and tingling in her hand. (Tr. 1114). She had been wearing a brace at night but it had not been helping. (*Id.*). She was assessed with right shoulder impingement syndrome and right upper extremity parasthesias. (Tr. 1115). At an office visit with Dr. Briggs on December 7, 2022, Adkins reported that the pain had become worse, now 8/10, despite her treatment with Mobic and an Arizona brace. (Tr. 1112). She was tender over the medial aspect of the ankle over the posterior tib tendon, and was able to do a single limb lift on the left three times but with no heel inversion, and pain. (*Id.*).

Adkins next saw Dr. Briggs on January 25, 2023 and reported more pain in the lateral aspect ankle sinus tarsi area. (Tr. 1108). Adkins indicated that injections had only made the pain worse, but as a single mother she could not afford to take the time off of work that would be necessary for surgery. (*Id.*). Her single limb rise on the left was weak and caused pain, while she was able to do one on the right. (*Id.*). Adkins attended an appointment with Kaitlin Martin, APRN-CNP, for pain management on March 30, 2023. (Tr. 1169). Adkins reported she was

wearing a brace for her foot and ankle, had received two cortisone injections and had tried physical therapy without relief. (*Id.*). She described the pain as constant, and aggravated by extened periods of standing or walking. (*Id.*). Her gait was antalgic, although she ambulated without an assistive device. (Tr. 1171). She had 5/5 muscle strength in her ankle dorsiflexion and plantar flexion, and increased sensitivity in the left medial heel. (*Id.*). Adkins was assessed with tarsal tunnel syndrome of left side pregabalin 75MG capsule; chronic pain syndrome; neuropathic pain; and posterior tibila tendinitis of left lower extremity. (*Id.*).

Adkins returned to the Emergency Department on April 13, 2023 for evaluation of central lower back pain. (Tr. 1164). She described the pain as 5/10, and said that it "radiates down into her upper butt." (*Id.*). The pain was worse with bending or lifting. (*Id.*). Her gait and range of motion were described as normal, though there was lumbar tenderness. (Tr. 1166). She was assessed with a strain of the lumbar region and lumbar radicular pain, and prescribed prednisone, and tizanidine, and provided a lidocaine patch. (Tr. 1167).

On April 24, 2023, Dr. Briggs advised Adkins that she had exhausted all conservative treatment for her left lower extremity, and the only remaining option was surgery. (Tr. 1106). Adkins indicated she would follow up with Dr. Briggs on an as needed basis, and requested a referral to the Pain Clinic for medications. (*Id.*).

Adkins met with Elizabeth Heitmeyer, APRN-CNP, of the Pain Clinic on May 8, 2023, and reported that she had found no relief from Lyrica. (Tr. 1156). At a follow-up appointment on May 23, 2023, Adkins indicated that her left foot continues to bother her and she notices more swelling by the end of the day. (*Id.*). She switched to gabapentin and tramadol, but neither provided relief. (*Id.*). She also reported a new pain that starts at the top of her buttocks and radiates to her outside hip. (*Id.*). Her gait was antalgic. (Tr. 1158).

5

Adkins saw CNP Martin on June 20, 2023 and reported that she had begun working at a fast food resturant and since then the pain in her foot had been severe. (Tr. 1151). Her brace has helped, but once she takes it off her foot swells. (*Id.*). She was restarted on Mobic, increased her dosage of gabapentin, and started on Norco as needed. (Tr. 1153). Adkins returned for follow-up on July 18, 2023, and reported generalized pain in hands, hips, and feet, while her left foot continues to be "very bothersome." (Tr. 1147). She did report that Norco was helping and asked to increase her dosage. (*Id.*).  She continued to report that only Norco was helping her on August 17, 2023. (Tr. 1815).

On October 30, 2023, Adkins' Norco dosage was decreased, and she declined a left tarsal tunnel injection under ultrasound guidance. (Tr. 1812). Her dosage of Topamax was increased on November 15, 2023. (Tr. 1868). On December 18, 2023, Adkins indicated that her current Topamax dosage "takes the edge off her pain," but her pain has been decreasing over the last several days. (Tr. 1853). Adkins was advised to seek a nutrition consult to help in mamaging her weight to decrease the impact on her pain. (Tr. 1859).

Adkins next met with her pain management provider on March 25, 2024. (Tr. 1840). She reported she was doing well with her pain, and that she found the Topamax to be beneficial. (*Id.*). She has, however, been experiencing pain in her right hip, and down through her right leg to her ankle, and she has been taking Norco twice daily to treat it. (*Id.*). Her assessment included rheumatoid arthritis, and she was referred to Dr. Mains for care of that condition. (Tr. 1844). Examination notes showed right SI joint pain with palpation, positive right straight leg raise, equivocal FABER on the right, and antalgic gait without assistive device. (*Id.*). She was again advised to seek a nutrition consult. (Tr. 1845).

6

On April 20, 2024, Adkins presented to the Mercy Health Emergency Department complaining of right knee pain. (Tr. 1896). An x-ray revealed her right knee to be normal. (Tr. 1897). Examination notes indicated there may be slight swelling around the anterior aspect of the lower knee, and Adkins was assessed with acute right knee pain. (Tr. 1898).

A lumbar x-ray performed on April 22, 2024 showed partial sacralization of L5 with bilateral pseudoarthroses, mild disc space narrowing L4-5, moderate disc space narrowing L5-S1, slight retrolithiasis L4 upon L5, mild degenerative changes of both SI joints, and no evidence of spondylosis or spondylolisthesis. (Tr. 1901-02). At an April 23, 2024 pain management appointment, Adkins reported that prednisone "helped take the edge off her right leg pain," but the pain returned to baseline when she discontinued taking it. (Tr. 1900). At a June 4, 2024 appointment, Adkins reported that the home exercises she had been doing for lower back pain had made the pain worse, and it was affecting her sleep. (Tr. 1910). She was referred for physical therapy and given a toradol injection, and recommended for a nutrition consult. (*Id.*).

Adkins had a rheumatology consultation with Dr. Mains on June 12, 2024 and reported intermittent arthritis with increased pain, stiffness, weakness, and joint swelling that typically last two to five days. (Tr. 1922). She complained of pain in her finger, left shoulder, lower back, bilateral hips, and left knee, and had morning stiffness in her hips and back. (*Id.*). Examination notes indicate tenderness in the left anterior shoulder with mild limited external and internal rotation of the left side. (Tr. 1923). There was tenderness of the lumbosacral spine, sacral sulci and Patrick right, but negative shobar and occiput to well. (*Id.*). Her assessment included a history of rheumatoid arthritis, chronic low back pain, SI degenerative joint disease, morbid obesity, and a scalp rash. (Tr. 1926). An x-ray of her SI joints performed June 19, 2024 showed

7

mild degenerative changes of both SI joints, dysplastic changes of both hips and mild degenerative changes of the right hip. (Tr. 1937).

### C.    Medical Opinion Evidence

On August 13, 2023, state agency reviewing physician Leslie Green, M.D., opined that Adkins was capable of performing work at the light exertional level, but could only occasionally climb ramps and stairs, and never climb ladders ropes or scaffolds; she could frequently balance, but only occasionally stoop, kneel, crouch, or crawl; she should avould concentrated exposure to extreme cold or vibrations; and she should avoid all exposure to unprotected heights, hazards, or commercial driving. (Tr. 77-78). Dr. Green's opinion was affirmed by state agency reviewing physician Steve McKee, M.D., on November 3, 2023. (Tr. 93-94).

### D.    Administrative Hearing Evidence

Adkins testified before an ALJ on June 6, 2024. (Tr. 46-63). Adkins stated that she is 31 years old, and that she had completed the 12th grade. (Tr. 47). She is employed at Pilot as a cashier and works no more than one or two days per week, typically in seven or seven and a half hour shifts. (Tr. 48-49). Adkins has a driver's license and had driven as recently as the day before the hearing. (Tr. 51-52). She resides in a house with her four children, ages 2 to13. (Tr. 52).

Adkins testified that she has problems doing household chores on the days her rheumatoid arthritis flares up, and she has to ask her older children to assist her. (Tr. 52-53). She often has to drive her older children to their activities, and she has missed attending some of their games because she is in too much pain to go. (Tr. 53-54). There are days the pain is so bad she is unable to get out of bed and has to ask her children's father to watch them. (Tr. 54). She is

8

generally able to cook, but during flares of arthritis she may be unable to cook and either her oldest child, her fiancée, or her mother will help her to get her children fed. (Tr. 54-55).

Adkins stated that she was recently diagnosed with deteriorating disc disease in her back and she is about to start physical therapy to treat it. (Tr. 55). Her back pain radiates into her hip and down her right leg. (*Id.*). She has back pain every day, and tries to relieve it by resting, elevating her left leg, taking ibuprofen or Tylenol, and applying heat. (Tr. 56). She also reports excruciating pain in her hands, shoulder, hip, knee, or ankle when her rheumatoid arthritis flares. (*Id.*). The affected area will become swollen and stiff to the point she can barely move it. (*Id.*). She has made many trips to the emergency room because of her arthritis, but has stopped going recently because she does not feel they can do anything to help her. (Tr. 57).

Adkins testified that she is in pain management for her left leg because her doctors have told her there is nothing else they can do for her other than surgery that would require six months for recovery. (*Id.*). Pain management has provided exercises she can do and has prescribed Norco and Topamax. (Tr. 57-58). She is usually incapable of getting on the floor to play with her two year old. (Tr. 58).

Under questioning from her attorney, Adkins testified that she is unable to work full time because she cannot stand for very long when her arthritis flares. (Tr. 59). If she has a flareup in her hands, arm, or shoulder, they get stiff to the point she can barely do her current job, and she often has to call off of work. (Tr. 59-60). She stated that her flareups happen three to five times weekly and can last from one to four days. (Tr. 61).

Adkins further testified that the pain in her left foot and ankle can happen any time, and when it does occur she tries to sit down, prop the foot up, and apply ice. (*Id.*). If the pain occurs at work she may try to work through it or she may ask to go home. (*Id.*). She tried wearing a

customized brace on the foot but that did not help, so now she wears a brace she puschased at Wal-Mart. (Tr. 63).

Once Adkins' testimony concluded, VE Luisa Suess testified. (Tr. 63-69). The VE classified Adkins' past work as a cashier, DOT 211.462-010, which is a light job with an SVP 2. (Tr. 64-65). For her first hypothetical the ALJ asked the VE to consider an individual of the claimant's age, educational background, and work history who is capable of performing light work, except that the individual can never climb ladders, ropes, or scaffolds, or crawl, and can only occasionally climb ramps or stairs, or crouch, kneel, or stoop; can frequently balance; can frequently reach, handle, or finger with the bilateral upper extremities; can occasionally push and/or pull but never operate foot controls with the left lower extremity; can have occasional concentrated exposure to extreme cold or heat, or humidity; can have occasional exposure to vibrations; cannot work around unprotected heights, heavy machinery or unprotected moving mechanical machinery; and cannot perform any commercial driving. (Tr. 65-66). The VE opined that such an individual would be capable of performing Adkins' past work, both as it is generally performed in the national economy, and as she actually performed it. (Tr. 66). The VE further opined that such an individual could also perform other light, SVP 2 jobs such as a price marker, DOT 209.587-034, with approximately 205,680 jobs in the national economy; as a garment sorter, DOT 22.687-014, with approximately 161,300 jobs in the national economy; and as an electronics worker, DOT 729.687-010, with approximately 22,900 jobs in the national economy. (Tr. 66).

For a second hypothetical, the ALJ asked the VE to consider all of the same circumstances of the first hypotherical, except that this individual would be limited to four hours standing or walking out of an eight-hour workday. (*Id.*). The VE opined that such an individual

could perform Adkins' past work as it is generally performed, but not as she actually performed it. (Tr. 67). The VE further opined that such an individual could perform the same jobs noted in the the first hypothetical, but with reduced numbers. (*Id.*). For such an individual there are approximately 61,400 price marker jobs in the national economy, approximately 40,300 garment sorter jobs, and approximately 5,700 electronics worker jobs. (*Id.*).

For her third hypothetical, the ALJ had the ALJ again consider all of the same circumstances of the first hypothetical, except that this individual would be limited to sedentary work. (*Id.*). The VE opined that this individual would be incapable of performing Adkins' past work, but could perform sedentary, SVP 2 jobs, such as final assembler, DOT 713.687-018, with approximately 20,700 jobs in the national economy; electronics inspector, DOT 726.684-110, with approximately 10,100 jobs in the national economy; and eyeglass frame polisher, DOT 713.684-038, with approximately 1,600 jobs in the national economy. (Tr. 67-68).

The VE then testified that employers will typically allow a 15-minute break in the morning and in the afternoon, and a 30-minute lunch break; will tolerate up to 10 percent of time off-task; and will tolerate one absence per month. (Tr. 68). Finally, under questioning from Adkins' attorney, the VE opined that if an individual when sitting at work needed to elevate their legs to waist level or higher, that would be work preclusive. (Tr. 69).

## IV. The ALJ's Decision

In her decision dated June 26, 2024, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2027.

2. The claimant has not engaged in substantial gainful activity since June 10, 2022, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: left sinus tarsal tunnel syndrome with degeration of the articular surfaces, tibial tendinitis, and

11

partially fused accessory navicular bone with reactive osteoedema of posterolateral talar body; chronic pain syndrome with neuropathic pain; rheumatoid arthritis; bilateral hip dysplastic changes; right hip osteoarthritis; lumbar degenerative disc disease; and bilateral sacroiliac joint osteoarthritis (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) excpt: She can never climb ladders ropes or scaffolds or crawl; occasionally climb ramps and stairs, crouch, kneel, and stoop; and frequently balance as set forth in the DOT. With the bilateral upper extremities, she can frequently reach, handle and finger. With the left lower extremity, she can occasionally push and/or pull and cannot operate foot controls. She can have occasional concentrated exposure to extreme cold, heat and humidity. She can have occasional exposure to vibration and cannot work around unprotected heights, heavy machinery, or unprotected moving mechanical machinery. She cannot perform any commercial driving.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)

7. The claimant was born on September 25, 1992, and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 10, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-29).

## V. Law and Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th

Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant

bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus,

entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is

supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C.

§ 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the

substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S.

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

14

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.     Discussion

Adkins raises two issue for this Court's review:

1. Whether the ALJ erred in failing to consider Adkins' obesity in isolation or in combination with other impairments in making the RFC determination.

2. Whether the ALJ erred in improperly finding Adkins' claim that she could not sustain full-time employment unsupported by the record because of her activities of daily living.

(ECF Doc. 8, at p. 1).

### A.  The ALJ properly considered obesity when determining the RFC.

Adkins contends that beyond "a few passing comment" the ALJ failed to consider her well documented history of obesity when formulating the RFC. (*Id.* at p. 14). Adkins asserts that this contravenes the mandates of SSR 19-2p(6) that requires the ALJ to "consider the limiting effects of obesity when assessing as (*sic*) person's RFC," and provide an explanation on how she reached a conclusion on whether obesity caused any limitations. (*Id.*). Adkins concedes that the ALJ considered obesity at steps two and three of the sequential evaluation, and at least "alluded to the existence of [Adkins'] obesity at step four," but argues that she was required to consider obesity through all steps of the analysis, including the RFC determination. (*Id.* at pp. 14-15). As there are numerous references to Adkins' obesity throughout the record, including advisements to seek a nutrition consultation, and the need to lose weight to improve systemic inflammation and to put less strain on her left foot, Adkins finds the ALJ's consideration of obesity to be deficient. (*Id.* at pp. 16-17).

The Commissioner retorts that the ALJ properly considered obesity at steps two and three of the sequential evaluation, finding that it was a non-severe impairment as it caused no more than a

minimal limition in her ability to perform basic work activities, and determining that it did not contribute to a finding that an impairment met or medically equaled the severity of a listed impairment. (ECF Doc 10, p. 7). Further, the decision shows the ALJ considered obesity when determining Adkins' RFC by discussing evidence indicating that she had been advised to lose weight in order to decrease its impact on her pain. (*Id.*). The ALJ also considered the opinions of the state agency medical consultants who did not specifically attribute any functional limitations to Adkins' obesity, determining the opinions to be of limited persuasive value, and finding a more restrictive RFC than that suggested be the agency consultants. (*Id.* at p. 8). The Commissioner notes that the ALJ indicated she had considered the entire record and all of Adkins' symptoms when formulating the RFC, and argues that this satisfied her burden. (*Id.*). Finally, the Commissioner argues that Adkins did not allege any additional limitations that she believes were warranted due to her obesity, nor has she pointed to any evidence from a treating or examining provider opining that she had any obesity related limitations, and without such she has not met her burden to prove that her condition created limitaitons. (*Id.* at p. 9).

Adkins argues in her Reply Brief  that the Commissioner's response does not adequately address the perceived deficiencies in how her obesity would impact her other conditions, most notably the stress it causes on her weight-bearing joints, and does not account for Adkins' testimony to limitations greater than those incorporated into the RFC finding. (ECF Doc. 11, pp. 1-4).

Although obesity is not a listed impairment, an ALJ must consider whether the functional limitations may medically equal a listing. SSR 19-2p; Titles II & XVI: Evaluating Cases Involving Obesity, 2019 WL 2374244, at *3 (May 20, 2019). At Step Two, obesity is considered a severe impairment when "the person's obesity, alone or in combination with another

16

impairment(s), significantly limits his or her physical or mental ability to do basic work activities." *Id.* The Court, however, will not make general assumptions about the severity or functional effects of obesity combined with another impairment. *Id.* The effect of obesity on a claimant's functioning is analyzed on a case-by-case basis and no specific weight, body-mass index, or descriptive terms by a medical source establish obesity as a severe impairment. *Id.* at *4.

At Step Four, the ALJ "must consider the limiting effects of obesity when assessing a person's RFC" and "explain how [the ALJ] reached our conclusion on whether obesity causes any limitations." SSR 19-2p; Titles II & XVI: Evaluating Cases Involving Obesity, 2019 WL 2374244, at *4 (May 20, 2019). In so doing, the ALJ must "consider all work-related physical and mental limitations, whether due to a person's obesity, other impairment(s), or combination of impairments." *Id.* Even if the ALJ's analysis regarding obesity is inadequate, to warrant remand it must be shown that that the plaintiff's obesity, alone or in combination with her other impairments, limited her functioning to a degree inconsistent with the RFC. *Said v. Comm'r of Soc. Sec.*, No. 1:25-CV-00220-CAB, 2025 WL 3484655, at *5 (N.D. Ohio Dec. 4, 2025).

The ALJ met her burden at step two of the sequential evaluation by noting the non-severe impairment of obesity and writing "that the record supports that [this] impairment caused no more than minimal limitations on [Adkins'] ability to do basic work activities." (Tr. 20). The ALJ added that in October 2023 Adkins was "noted to be obese and advised to seek nutrition counseling to help manage her weight to decrease its impact on pain." (*Id.*). There is no indication from this reference that Adkins' obesity was significantly limiting her ability to do basic work activities, so a finding of non-severity is merited. Further, while citing to several instances in the record where Adkins was advised to seek nutrition consults and lose weight, as it

17

would help manage her weight's impact on pain and systemic inflammation (ECF Doc. 8, p. 16-17), there is no specific reference to how work functions were impaired as a result of her weight. Thus, the finding of non-severity should not be disturbed.

With regard to step four, as Adkins acknowledges, the ALJ noted three instances in the decision where Adkins was advised to seek a nutrition consult and to lose weight to reduce the impact of her obesity on her pain, showing that the ALJ considered the effect obesity had on the RFC. (Tr. 26). As Adkins correctly points out, there were several other instances not referenced by the ALJ where Adkins' doctor made a similar recommendation. (ECF Doc. 8, at pp. 16-17, citing Tr. 970-71, 1150, 1154, 1159, 1163, 1172, 1812, 1818, 1895, 1904, 1914, 1926, 1935). But additional examples of similar advisements do not show to any greater extent that Adkins' obesity was limiting her functioning to a degree inconsistent with the RFC. Further, there are no expert medical opinions in the file that suggest that obesity is a severe condition bringing about any functional impairment, whether included in the RFC or otherwise. Without evidence of a functional limitation, Adkins has not shown how her obesity, alone or in combination with her other impairments, limited her functioning to a degree inconsistent with the RFC found by the ALJ, and I therefore decline to recommend remand on this basis.

### B. The ALJ did not err in her consideration of Adkins' activities of daily living when evaluating her her subjective complaints.

Adkins next argues that the ALJ mischaracterized the evidence in the record when writing in support of her RFC determination that Adkins could "get to appointments, work part time, cook, drive, do some housework, shop, and go to her children's practices." (ECF Doc 8, p. 17). Adkins believes this overgeneralizes her activities, noting, for example, that while she can work part-time, she testified she is limited to seven-and-a-half hour work shift, one or two days per week, and even on those days, she may have to ask to sit down or leave early. (*Id.* at pp. 17-18).

18

Similarly, Adkins argues that while she may be able to perform some household tasks, the ALJ failed to note that she sometimes needs to ask for her children's assistance. (*Id.* at p. 19). And while she may attend some of her children's activities, she misses others, noting as an example that she has missed three of her daughter's softball games. (*Id.*). Even assuming that she is capable of some of the activities of daily living, Adkins contends that this does not translate to being able to perform full time work.(*Id.* at pp. 19-20).

The Commissioner argues that the ALJ properly considered Adkins' activities of daily living as one factor in her analysis of the consistency of her subjective complaints with the evidence in the record. (ECF Doc. 10, p. 12). The Commissioner notes that Adkins testified to being able to work as a cashier for between 7.5 and 15 hours per week, and the ALJ discussed those hours and acknowledged Adkins' testimony regarding calling off or leaving work early in the decision. (*Id.* at p. 13, citing Tr. 23-24). The ALJ's decision further acknowledged Adkins' testimony regarding her challenges in performing household chores, and asserts that those challenges do not automatically negate the conclusion that her ability to perform these tasks was not fully consistent with her allegations of disabling limitations. (*Id.* at pp. 13-14). The Commissioner argues that the claims set forth here by Adkins are merely an invitation to reweigh the evidence by promoting her own alternative interpretation of the record, an exercise that would be beyond this Court's purview. (*Id.* at p. 14). In her Reply Brief, Adkins argues this is not an invitation to reweigh the evidence, rather, it challenges whether the ALJ properly built a logical bridge from the evidence to the findings. (ECF Doc. 11, pp. 5-6).

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a

claimant's subjective symptom complaints and may properly discount the claimant's testimony about his/her symptoms when it is inconsistent with objective medical and other evidence.[2] *See Jones*, 336 F.3d at 475-76; SSR 16-3p, ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, *including the claimant's daily activities*, the nature of the claimant's symptoms, the claimant's efforts to alleviate his/her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p; 20 C.F.R. § 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (emphasis added) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his/her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.[3] *See Renstrom v.*

---

[2] In explaining the importance of "other evidence," SSR 16-3p provides that:

> We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. . . . If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations.

SSR 16-3p.

[3] As Adkins alleges error only with regard to the portion of the subjective complaints analysis related to her activities of daily living, the Report and Recommendation is limited accordingly. Adkins waives any arguments not raised in her brief and arguments mentioned only perfunctorily without argument. *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("we limit our consideration to the particular points that [Plaintiff] appears to

*Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)). While the ALJ must discuss significant evidence supporting his/her decision and explain his/her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

In her decision the ALJ acknowledged Adkins' testimony concerning the limited number of hours she is able to work on a weekly basis due to pain, her challenges doing chores, and occasionally missing her children's practices when having an arthritis flare, and her inability to get down on the floor to play with her children. (Tr. 23). But the ALJ found these allegations inconsistent with the records because during the adjudicated period Adkins "could get to appointments, work part time, cook, drive, do some housework, shop and go to her children's practices." (Tr. 28). These statements do not misrepresent Adkins' testimony, as it acknowledges that during her testimony Adkins qualified her ability to work part time and to do "some" housework. It does not indicate that she attended all practices or prepare all meals, but, consistent with testimony, notes that these functions were performed during the period in question. (*See* Tr. 47-63).

---

raise in her brief on appeal."); see also *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (citation omitted)).

In conjunction with other factors enumerated in SSR 16-3p, it was proper for the ALJ to consider these activities of daily living when assessing Adkins' subjective complaints, and it is noteworthy that the ALJ's RFC determination was in fact more restrictive than those of the medical experts who opined on this matter. In explaining how she arrived at her determination of the RFC, as compared to that of the state agency medical consultants, the ALJ wrote:

> That the claimant could lift and or carry 10 pounds frequently and twenty pounds occasionally and never climb ladders, ropes, scaffolds; frequently balance; occasionally climb ramps, steers,stoop, kneel, crouch, crawl is consistent with the claimant's testimony that she can pick up her two-year-old that weighs 30 pounds but it is inconsistent with the claimant's pain in her back and frequent flares with hand pain, left shoulder pain, bilateral hip pain and back pain (10F/1-7; 9F/1;7F; 5F). That the claimant could frequently push and pull with the left lower extremity isconsistent with the reports that she had five out of five motor muscle strength in the bilateral
>
> ankle dorsiflexion, and ankle plantar flexion and sensation intact in the lower limbs, with increased sensitivity to the left medial heel with increased pain in her left foot and ankle and tenderness of the sinus tarsal (5F/10; 9F/1; 7F/28-31). Additional limitations have been added of she can frequently reach, handle, and finger because she reported numbness and tingling in her hand and that the brace, she had been given was not improving her pain (3F/19). She has further been reduced to sedentary due to having pain in the finger, left shoulder, lower back, bilateral hips, left knee that was dull and aching and worse in the afternoons and evenings and morning stiffness lasting 30 to 60 minutes in her hips and back with intermittent tingling and burning in her hands and musculoskeletal tenderness with weakness in the left foot and ankle (10F/1- 2; 8F/1).

(Tr. 27). There is substantial evidence offered in support of the RFC, and it is clear that the ALJ considered the claimant's pain and subjective complaints when crafting the RFC. To reassess the RFC on the basis of Adkins' view that her subjective complaints were not properly considered would require a reweighing of the evidence, and that is not an appropriate exercise for the Court to undertake. This issue, therefore, does not countenance remand.

22

**Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend the Commissioner's final decision denying Adkins' applications for DIB and SSI be affirmed.

Dated: June 18, 2026

Reuben J. Sheperd
United States Magistrate Judge

_____

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

*** *

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

23

specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)